JS 44  (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.    *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

GRACE OCEAN PRIVATE LIMITED, as Owner of the M/V DALI, and SYNERGY MARINE PTE LTD, as Manager

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Terry M. Henry, Esquire- Blank Rome, LLP 215-569-5500
130 North 18th Street, Philadelphia, PA 19103

### DEFENDANTS

Hyundai Heavy Industries Co., Ltd.

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☒ 3  Federal Question *(U.S. Government Not a Party)* |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☒ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1333
Brief description of cause:
Casualty was caused by negligence or gross negligence in the design, construction, and/or manufacture of a critical switchboard

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.     DEMAND $ _____     CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*     JUDGE _____     DOCKET NUMBER _____

DATE
07/31/2025

SIGNATURE OF ATTORNEY OF RECORD
/s/ Terry M. Henry

**FOR OFFICE USE ONLY**

RECEIPT # _____     AMOUNT _____     APPLYING IFP _____     JUDGE _____     MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**

Place of Accident, Incident, or Transaction: ___Port of Baltimore_____

---

***RELATED CASE IF ANY:*** Case Number:_____ Judge:_____

1. Does this case involve property included in an earlier numbered suit?   Yes ☐

2. Does this case involve a transaction or occurrence which was the subject of an earlier numbered suit?   Yes ☐

3. Does this case involve the validity or infringement of a patent which was the subject of an earlier numbered suit?   Yes ☐

4. Is this case a second or successive habeas corpus petition, social security appeal, or pro se case filed by the same individual?   Yes ☐

5. Is this case related to an earlier numbered suit even though none of the above categories apply?   Yes ☐
   If yes, attach an explanation.

I certify that, to the best of my knowledge and belief, the within case ☐ **is** / ☒ **is not** related to any pending or previously terminated action in this court.

---

**Civil Litigation Categories**

*A.* ***Federal Question Cases:***

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Wage and Hour Class Action/Collective Action
☐ 6. Patent
☐ 7. Copyright/Trademark
☐ 8. Employment
☐ 9. Labor-Management Relations
☐ 10. Civil Rights
☐ 11. Habeas Corpus
☐ 12. Securities Cases
☐ 13. Social Security Review Cases
☐ 14. Qui Tam Cases
☐ 15. Cases Seeking Systemic Relief  **\*see certification below\***
☒ 16. All Other Federal Question Cases. *(Please specify)*: ___28 U.S.C. § 1333_____

*B.* ***Diversity Jurisdiction Cases:***

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify)*:_____
☐ 7. Products Liability
☐ 8. All Other Diversity Cases:  *(Please specify)*_____
   _____

I certify that, to the best of my knowledge and belief, that the remedy sought in this case ☐ **does** / ☒ **does not** have implications beyond the parties before the court and ☐ **does** / ☒ **does not** seek to bar or mandate statewide or nationwide enforcement of a state or federal law including a rule, regulation, policy, or order of the executive branch or a state or federal agency, whether by declaratory judgment and/or any form of injunctive relief.

---

**ARBITRATION CERTIFICATION (CHECK ONLY ONE BOX BELOW)**

I certify that, to the best of my knowledge and belief:

[X] Pursuant to Local Civil Rule 53.2(3), this case is not eligible for arbitration either because (1) it seeks relief other than money damages; (2) the money damages sought are in excess of $150,000 exclusive of interest and costs; (3) it is a social security case, includes a prisoner as a party, or alleges a violation of a right secured by the U.S. Constitution, or (4) jurisdiction is based in whole or in part on 28 U.S.C. § 1343.

☐ None of the restrictions in Local Civil Rule 53.2 apply and this case is eligible for arbitration.

NOTE: A trial de novo will be by jury only if there has been compliance with F.R.C.P. 38.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| GRACE OCEAN PRIVATE LIMITED, as Owner of the M/V DALI, and SYNERGY MARINE PTE LTD, as Manager of the M/V DALI <br><br> v. <br><br> Hyundai Heavy Industries Co., Ltd. | Docket No. |

## COMPLAINT

Plaintiffs GRACE OCEAN PRIVATE LIMITED, owner of the M/V DALI ("Vessel"), and

SYNERGY MARINE PTE LTD., manager of the Vessel, by their undersigned counsel, for their

complaint against Defendant Hyundai Heavy Industries Co., Ltd allege upon information and

belief as follows:

### PARTIES, JURISDICTION AND VENUE

1.      This is a case of admiralty and maritime jurisdiction, as hereinafter more fully

appears, and is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal

Rules of Civil Procedure.  The Court has admiralty jurisdiction under 28 U.S.C. § 1333.

2.      Plaintiff GRACE OCEAN PRIVATE LIMITED ("Owner") is a corporation

organized and existing under the laws of Singapore with its registered office in Singapore. At all

relevant times, Owner was the registered owner of the M/V DALI.

3.      Plaintiff SYNERGY MARINE PTE LTD. ("Synergy") is a corporation organized

and existing under the laws of Singapore with its registered office in Singapore. At all relevant

times, Synergy was the manager of the M/V DALI. At all relevant times, Synergy had substantial

control of and exercised dominion over the Vessel.

1

4.      The M/V DALI (IMO No. 9697428) (the "Vessel") is a 10-000 TEU-class containership of 95,128 gross metric tons, registered under the laws of Singapore. The Vessel was built by Hyundai Heavy Industries Co., Ltd ("HHI"), with construction beginning in July 2014 and delivery in March 2015.

5.      Upon information and belief, Defendant HHI was and still is, a corporation organized and existing under the laws of South Korea with its registered office in South Korea. HHI's is registered as a Foreign Business Corporation in Pennsylvania, with Registration Number 3080095.

6.      Jurisdiction exists in the United States District Court for the Eastern District of Pennsylvania as this is a claim brought pursuant to the General Maritime Law as an admiralty matter pursuant to Rule 9(h) of the Federal Rules of Civil Procedure and HHI maintains an agent for the service of process in the State of Pennsylvania and, pursuant to 42 Pa. Cons. Stat. § 5301(a)(2)(i), (b), has consented to be sued in Pennsylvania on any claim.

7.      Venue is appropriate in the Eastern District of Pennsylvania pursuant to 28 USC Section 1391(b) as Defendant HHI resides within this District.

## BACKGROUND FACTS

8.      This maritime case arises from the allision by the Vessel with the Francis Scott Key Bridge (the "Key Bridge") on March 26, 2024 ("Casualty").

9.      The Vessel was designed, constructed, and outfitted by HHI. As alleged below, the evidence at trial will show that the Casualty was caused by HHI's negligence or gross negligence in the design, construction, and/or manufacture of a critical switchboard that was installed in the Vessel (the "Switchboard").

2

## THE CASUALTY

10.    On March 26, 2024, the Vessel departed Baltimore, Maryland, bound for Colombo, Sri Lanka, with an ultimate destination of Yantian, China. The Vessel had a cargo of 4679 containers on board.

11.    At or about 00:40 local time on March 26, 2024, the Vessel left berth at the Port of Baltimore with two tugs alongside and a pilot and apprentice pilot onboard, as is the requisite procedure in the Port of Baltimore. At or about 00:55 local time, the aft tug cast off from the Vessel. At or about 00:57 local time, the Vessel turned to port. At or about 01:08 local time, the forward tug cast off from the Vessel.

12.    The Vessel entered the shipping channel at or about 01:08 local time and was heading 141 degrees true. At or about 01:25 local time, the Vessel experienced a loss of power and propulsion in the shipping channel. The Vessel made efforts to regain power, which occurred briefly, but power was lost a second time shortly thereafter.

13.    The Vessel put on a port rudder and then let go the port anchor to attempt to stop it from drifting to starboard.

14.    At or about 01:28 local time on March 26, 2024, the Vessel allided with the Key Bridge.

15.    As a result of the Casualty, portions of the Key Bridge collapsed and were damaged. The Vessel and certain cargo aboard also sustained damage.

16.    Prior to the Casualty, eight construction workers were on the bridge. Two of these workers allegedly suffered injuries, and six died following the Casualty.

## THE VESSEL'S MAIN AND AUXILLIARY ENGINES

17.     The Vessel is propelled by a single, slow-speed diesel engine rated for 55,626 hp (41,480 kW) at 82.5 RPM, manufactured by HHI under license from MAN B&W. The engine is directly connected to a single, right-turning propeller.

18.     The Vessel has four Himsen diesel generators. Diesel generators No. 1 and No. 4 are rated at 4,580 kW and diesel generators No. 2 and No. 3 DGs are rated at 4,000 kW.   The Vessel also has one emergency diesel generator which is rated at 200 kW.[1]

19.     To run the main engine, one of the Vessel's four diesel generators must be operating and supplying the Vessel with electrical power. The emergency generator alone cannot be used to restart or run the main engine.

## THE VESSEL'S ELECTRICAL POWER DISTRIBUTION SYSTEM

20.     The Vessel's electrical system is powered by the four diesel generators, which supply alternating current at 6,600 volts. The diesel generators are connected to a 6,600-volt high-voltage ("HV") main electrical bus[2] contained within the HV switchboard via vacuum circuit breakers ("VCB").[3]

---

[1] A diesel generator is a diesel engine coupled to an electric alternator. The engine provides mechanical energy that is converted to electrical energy by the alternator.

[2] An electrical bus is a physical part of an electrical switchboard. (The term bus is a shortened form of "bus bars," which are the metal bars physically located within the switchboard.) The bus distributes the power produced by the generators to systems/devices that require electrical power.

[3] A circuit breaker is a switch that can close (to facilitate the flow of electricity) or open (to stop the flow of electricity). A circuit breaker connects the electrical power on a bus to the systems or devices that require electrical power.  A vacuum circuit breaker is a specific type of circuit breaker that interrupts the current in a vacuum.



Fig. 1. Schematic diagram of the Vessel's electrical power distribution system.

21.     The main engine lubricating oil pumps, bow thruster (a propulsor on the bow that is used to assist with the vessel's maneuverability when docking and undocking), and the refrigerated containers that cool temperature-sensitive cargo are powered directly from the HV switchboard.



Fig. 2. The Vessel's HV switchboard (located in the Engine Control Room).

22.     The Vessel has a Power Management System ("PMS") computer that monitors the diesel generators' operating state and electrical output, among other functions. The PMS is designed to automatically disconnect a diesel generator from the switchboard when it detects an abnormal condition with that generator, such as low voltage or low frequency.

23.     A 440-volt low-voltage (LV) electrical bus is connected to the HV bus via two 6.6 kV / 440 V step down transformers designated "TR-1" and "TR-2".[4] The HV bus is connected to

---

[4] A step-down transformer converts high voltage to a lower voltage, which then supplies electrical power to equipment throughout the Vessel.

the transformers with VCBs labeled "HR-1" and "HR-2." The transformers are connected to the LV bus with air circuit breakers ("ACB") labeled "LR-1" and "LR-2."

24.    The LV bus provides power for Vessel lighting and other equipment, including steering gear pumps and the main engine cooling water pumps.

25.    Circuit breakers in the Vessel's electrical system also are used to protect electrical equipment by disconnecting the power supply when an abnormal condition is detected in a circuit or system. Abnormal conditions are detected by protection devices, which act on a series of control relays or devices that will "open" or "trip" the breaker, interrupting the electrical power to the circuit.[5]

26.    One such protective device used in the control and monitoring of the transformer high voltage circuit breakers HR-1 and HR-2 is the Hyundai Intelligent Measuring and Protection Model T ("HIMAP-T"). The HIMAP-T monitors the amount and direction of electrical current flowing to the transformer and acts on a device called an under-voltage release ("UVR"). The UVR is device with a spring-loaded electrical coil inside the VCB that activates and opens the breaker when its control voltage (110 volts DC) is interrupted by a signal from the HIMAP-T or otherwise from the breaker control circuit.  For the HR-1 or HR-2 circuit breakers to successfully close or remain closed, the UVR control circuit must be supplied with control voltage within an allowable range. If the breaker's UVR control circuit loses voltage or senses a drop in voltage below the allowable limit, the HR-1 or HR-2 circuit breaker will open, disconnecting TR1 or TR2 from the HV switchboard, resulting in a loss of power supply to the LV switchboard.

27.    The circuit breaker control relays are contained within the control section of the

---

[5] A relay is an electrically operated switch. They commonly use an electromagnetic coil to operate their internal mechanical switching mechanism (i.e., contacts).

Switchboard, adjacent to the enclosures housing the electrical generator and transformer VCB. Wires running between the individual relays and a series of "terminal blocks" connect the relays into their respective control circuits.



Fig. 3. Terminal block arrangement inside of the circuit breaker control enclosure.



Fig. 4.  An exemplar terminal block identical to the model used in the vessel.  (Source WAGO.com.)

### THE ENGINE AND POWER WHILE TRANSITING OUT OF BALTIMORE

28.    At about 01:25 local time on March 26, while the Vessel was transiting out of Baltimore Harbor, circuit breakers HR-1 and LR-1, which fed most of the Vessel's equipment and lighting unexpectedly opened, causing a loss of electrical power to the LV Switchboard.  At this time, the Vessel was operating on diesel generators No. 3 and No. 4, and the LV Switchboard was powered by TR-1.

29.    When the LV switchboard experienced a loss of electrical power, various main engine auxiliary systems shut down, causing the main engine to shut down. The loss of electrical power also stopped all three steering pumps, making the rudder unable to be moved hydraulically.

30.    The crew recovered the LV Switchboard by manually closing breakers HR-2 and LR-2 which switched transformers from TR-1 to TR-2.  This reconnected diesel generators No. 3 and No. 4, restoring electrical power to the LV bus.

31.     Although the Vessel's crew was able to restore electrical power, at about 01:27 local time, an electrical blackout occurred when the circuit breakers connecting diesel generators No. 3 and No. 4 to the HV bus opened, causing a total loss of Vessel electrical power to the HV and LV buses.

32.     Meanwhile, the Vessel's course drifted to starboard towards Pier 17 of the Key Bridge.  Because of the initial loss of power, which caused the engine systems to shut down, it was not possible for the crew to restart the engine with sufficient time to alter the ship's course and/or speed to avoid the bridge.

33.     After the second power outage, diesel generator No. 2, started automatically because it was in 1st standby mode, and used to restore power to the HV bus, with the crew manually reengaging TR-2 to restore power to the LV Switchboard.

34.     Nevertheless, at 01:28 local time, the Vessel allided with the Key Bridge.

## THE LOOSE SIGNAL WIRE AT NODE 381

35.     Shortly after the incident, an investigation was undertaken examining the Vessel and its electrical components to determine the cause of the initial loss of the power to the LV Switchboard. The investigation developed information suggesting that the outage may have originated in the HV Switchboard, specifically in the UVR control circuit.

36.     It was observed during the course of the investigation that the UVR coil for circuit breaker HR-1 was not receiving control voltage as it should, and that one of the control signal wires in the UVR control circuit at node 381, was not securely connected to its terminal block. The unsecure control signal wire was part of a control circuit that opens HR-1 VCB. This circuit removes control voltage to the UVR, which causes HR-1 VCB to open, when commanded to do so by the HIMAP-T protection device or breaker control switch on the HV switchboard.

10

37.     Because this signal wire was not securely connected to the terminal block, the insufficient contact created an open circuit between the signal wire and the terminal block. The UVR control voltage, necessary for the HR-1 VCB to close or remain closed, was lost because of this open circuit. This open circuit subsequently caused HR-1 circuit breaker to open, disconnecting transformer TR-1 from the HV Switchboard, and subsequently causing the initial loss of power to at the LV Switchboard.

38.     The loss of the UVR control voltage was not recorded by the HIMAP-T.

39.     The signal wire was not securely connected to the terminal block because the labeling band identifying the wire was installed too close to the ferrule crimped on the end of the wire. (See Figures 5 and 6 comparing the labeled and unlabeled signal wire.) As a result of this and other defects, the signal wire could not be inserted fully into the terminal block's spring clamp gate. (See Figure 7.)



Figure 5. Signal wire from node 381 removed from the terminal block connection point 1. (Source NTSB.gov.)



Figure 6. Signal wire from node 381 removed from the terminal block connection point 3. (Source NTSB.gov.)



Figure 7. Wires 1 and 3 from Terminal Block 381 inserted to the maximum possible depth inside the corresponding connection points in a disassembled exemplar terminal block. (Source NTSB.gov.)

12

## THE LIMITATION ACTION

40.     On April 1, 2024, Plaintiffs filed a Petition for Exoneration From or Limitation of Liability pursuant to 46 U.S.C. §§ 30501, *et seq*., as supplemented and amended (the "Limitation Act"). In the Limitation Petition, Plaintiffs claimed exoneration from liability for any and all losses or damage arising out of the Casualty and from any and all claims for damages that have been or may be filed. Plaintiffs further alleged that they have valid defenses to any and all such claims.

41.     On April 1, the District Court for the District of Maryland issued an order directing the issuance of a notice to all persons asserting claims related to the Casualty, with any such claims to be filed by September 24, 2024 ("Limitation Action").

42.     Forty-five claims remain in the Limitation Action by various claimants ("Claimants in the Limitation Action"). The claims that have been filed are for property damage, economic damages, clean-up costs, personal injury, wrongful death, survival, workers' compensation reimbursement, and cargo and general average.

## FIRST CAUSE OF ACTION
### (STRICT PRODUCTS LIABILITY-DEFECTIVE DESIGN)

43.     Plaintiffs repeat and re-allege each and every allegation hereinabove set forth, with the same force and effect as if herein repeated and set forth at length.

44.     Maritime law applies to a tort claim when it satisfies both the "location" and "connection" tests as outlined in *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co*., 513 U.S. 527, 534, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995).

45.     The location test is satisfied for this allision as the events giving rise to this claim occurred on the navigational waters in the Port of Baltimore.

46.     The connection test is also met because the incident involves an allision between the Vessel and the Key Bridge that caused a disruptive impact upon maritime commerce in the

State of Maryland, severely damaging both the Vessel and the Key Bridge, and removing both the from the stream of maritime commerce for a significant period.

47. Furthermore, the incident was related to vessel navigation, a traditional maritime activity.

48. A maritime products liability claim requires that a manufacturer such as HHI (1) sold or manufactured the product, (2) that the product was unreasonably dangerous or was in a defective condition when it left the defendant's control, and (3) that the defect resulted in injury to Plaintiffs and the claimants in the above-captioned action.

49. HHI designed and manufactured the Vessel and the defective Switchboard that was installed by HHI on the Vessel.

50. HHI defectively designed the Switchboard in such a manner that wiring connections were not secure, could not be verified as secure, and could lose connection during normal operation, such that the signal wire was not designed to remain securely connected to the terminal block, which design defect caused the Switchboard and the Vessel to be unreasonably dangerous and in a defective condition when it left HHI's control.

51. As a result of the defectively designed Switchboard, the Vessel suffered a power outage that led to the allision with the Key Bridge.

52. Plaintiffs sustained significant damages as a result of the allision, including physical damage to the Vessel, complete destruction of the Key Bridge and significant removal costs to clear the channel of debris, as well as the tragic loss of life and injury to workers on the Key Bridge. Plaintiffs are also facing claims from the Claimants in the Limitation Action and have also sustained significant damage to their reputation. HHI is liable to Plaintiffs for these damages as the defective design and construction of the Switchboard was the cause of the allision.

14

## SECOND CAUSE OF ACTION
## (STRICT PRODUCTS LIABILITY - DEFECTIVE MANUFACTURING)

53.     Plaintiffs repeat and re-allege each and every allegation hereinabove set forth, with the same force and effect as if herein repeated and set forth at length.

54.     HHI designed and manufactured the Vessel and the defective Switchboard that was installed by HHI on the Vessel.

55.     HHI defectively manufactured the Switchboard and Vessel by failing to ensure that all wires were securely connected to their terminal blocks when installed and unable to loosen during normal operation, including the wire at connection point 1 of node 381, which manufacturing defect made the Switchboard and Vessel unreasonably dangerous and in defective condition when it left HHI's control.

56.     HHI's defective manufacture of the Switchboard and Vessel caused the signal wiring to come loose in normal operation, resulting in the power outage that led to the allision.

57.     Plaintiffs sustained significant damages as a result of the allision including physical damage to the Vessel, complete destruction of the Key Bridge and significant removal costs to clear the channel of debris, as well as the tragic loss of life and injury to workers on the Key Bridge. Plaintiffs are also facing claims from the Claimants in the Limitation Action, and have also sustained significant damage to their reputation. HHI is liable to Plaintiffs for these damages as the defective manufacture of the Switchboard was the cause of the allision.

## THIRD CAUSE OF ACTION
## (BREACH OF IMPLIED WARRANTIES)

58.     Plaintiffs repeat and re-allege each and every allegation hereinabove set forth, with the same force and effect as if herein repeated and set forth at length.

15

59.     HHI is a merchant dealing in the construction and sale of containerships, such as the Vessel here.

60.     Implied in HHI's sale of the Vessel to Owner was that the Vessel would pass without objection in the trade, be fit for the ordinary purposes for which containerships are used, and be safe, seaworthy, and otherwise merchantable.

61.     Owner relied on HHI's implied warranty, which became a basis for Owner's agreement to purchase the Vessel.

62.     HHI breached this implied warranty because the inadequate design and manufacture of the wiring, which came loose, lost connection, and caused harm, did not conform to the minimum industry standards.

63.     Relying on HHI implied warranty that the Vessel was merchantable, seaworthy and fit for its ordinary purpose, and without knowledge of the defects in the Vessel, Plaintiffs ordered the Vessel to sail from Baltimore and suffered the losses described in this Complaint as a result.

## FOURTH CAUSE OF ACTION
## (NEGLIGENT MISREPRESENTATION)

64.     Plaintiffs repeat and re-allege each and every allegation hereinabove set forth, with the same force and effect as if herein repeated and set forth at length.

65.     As a manufacturer of container ships, HHI was or should have been aware of the risks associated with loose wires in the Switchboard.

66.     HHI represented upon delivery that the Vessel was safe, seaworthy, and fit for its ordinary purpose, which included that the Vessel's wiring and general construction met industry standards and would withstand normal operations.

67.     As the Owner and Manager of the Vessel, Plaintiffs were entitled to and did rely on that representation by HHI in transiting out of Baltimore.

16

68.     HHI's representation was demonstrably false as represented by the defects found in the Switchboard of the Vessel.

69.     HHI knew or should have known of, but disregarded, an unjustifiably high risk of harm to the safety of the Vessel's crew and of liability to Plaintiffs as a result of any damage caused by the Vessel after losing power, by failing to notify the Plaintiffs or other necessary parties of the potential for loose wiring in the Vessel's Switchboard.

70.     Relying on HHI's representations that the Vessel was seaworthy and fit for purpose, and without knowledge of the defects in the Vessel, Plaintiffs ordered the Vessel to sail from Baltimore and suffered the losses described in this Complaint as a result.

## FIFTH CAUSE OF ACTION
### (NEGLIGENCE)

71.     Plaintiffs repeat and re-allege each and every allegation hereinabove set forth, with the same force and effect as if herein repeated and set forth at length.

72.     HHI had a duty to design and manufacture a Vessel was safe and seaworthy under all foreseeable operating conditions.

73.     HHI breached its duty by negligently designing, constructing or installing the Switchboard such that its wires loosened so much as to fail to be operational at crucial moments during the Vessel's transit. HHI also negligently failed to construct the Vessel or install the Switchboard with a safety margin sufficient to function during ordinary use.

74.     Plaintiffs used and operated the Vessel, main engine, and Switchboard in an entirely foreseeable manner, and when it lost power, the Vessel sustained no external forces beyond what were reasonably expected.

75.     HHI's breach of its duty to design and construct a safe and seaworthy caused the Vessel to sustain a blackout and allide with the Key Bridge.

17

76.    HHI materially withheld its knowledge of the potential for loose wires in the Switchboard.

77.    HHI knew or should have been aware the Vessel was at risk of power outages due to loose wiring in the Switchboard, and had a duty to take appropriate precautions to rectify the issue or notify Plaintiffs. Instead, HHI breached its duty to Plaintiffs by taking no such action causing the Vessel to sustain a blackout long enough that it allided with the Key Bridge.

78.    Plaintiffs were directly damaged as a result of HHI's negligent conduct. They incurred, and continue to incur, substantial costs to litigate claims arising out of the Casualty.

**SIXTH CAUSE OF ACTION**
**(INDEMNITY AND/OR CONTRIBUTION)**

79.    Plaintiffs repeats and realleges each and every allegation hereinabove set forth, with the same force and effect as if herein repeated and set forth at length.

80.    The Casualty was caused in whole or in part by the acts, omissions, fault, negligence, gross negligence, and/or design or manufacturing defect of HHI.

81.    To the extent Plaintiffs may be held liable to Claimants in the Limitation Action and/or certain other third parties, whether by judgment or settlement, Plaintiffs are entitled to indemnity and/or contribution from HHI, including recovery of attorneys' fees and costs incurred in defending against such claims.

**WHEREFORE,** Plaintiffs demand their compensable damages consisting of, but not limited to:

   a.   The cost of physical damage to the Vessel and the resulting costs of repair and replacement;

   b.   Contribution and/or indemnity for any and all damages sustained by the Claimants in the Limitation Action;

   c.   Pre-judgment interest, post-judgment interest and court costs;

18

d. Attorneys' fees; and

e. Such other damages to which Plaintiffs may be justly entitled.


Dated: July 31, 2025                          BLANK ROME LLP

                                              /s/ Terry M. Henry

                                              Terry M. Henry (Bar No. 77455)
                                              Terry.Henry@blankrome.com
                                              One Logan Square
                                              130 North 18th Street
                                              Philadelphia, PA 19103
                                              (215) 569-5500

                                              William R. Bennett, III*
                                              William.Bennett@blankrome.com
                                              Thomas H. Belknap, Jr.*
                                              Thomas.Belknap@blankrome.com
                                              Alan M. Weigel*
                                              Alan.Weigel@blankrome.com
                                              1271 Avenue of the Americas
                                              New York, NY 10020
                                              (212) 885-5000

                                              Emma C. Jones*
                                              Emma.Jones@BlankRome.com
                                              1825 Eye Street NW
                                              Washington, DC 20006
                                              (202) 420-2200

*Of counsel,*

DUANE MORRIS LLP
Robert B Hopkins*
rbhopkins@duanemorris.com
1201 Wills Street, Suite 330
Baltimore, MD 21231
(410) 949-2900

                                              **Pro hac vice* motions pending